# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Lee Reed, | Case No. 2:21-cv-00942-APG-EJY |
| Plaintiff | **Order Denying Petition for Writ of Habeas Corpus and Granting a Certificate of Appealability** |
| v. | |
| Nethanjah Breitenbach,[1] et al., | [ECF No. 1] |
| Defendant | |

In 2013, a jury convicted petitioner Lee Reed of first-degree murder with use of a deadly weapon and failing to stop on the signal of a police officer. The jury imposed a sentence of life with the possibility of parole after 20 years for the first-degree murder conviction, and the trial court imposed, among other things, a consecutive sentence of 48–240 months for the use of a deadly weapon. ECF No. 3-8 at 2–3. Reed filed a petition for writ of habeas corpus under 28 U.S.C. § 2254.[2] He claims (1) Jury Instruction No. 33 lessened the State's burden of proof; (2) the court's failure to give Reed's proffered eyewitness-identification instructions violated due process; and (3) trial counsel was ineffective in failing to object to the trial court's structural error when it failed to administer an oath of truthfulness to the venire. ECF No. 1. I deny the petition and will issue a certificate of appealability for Ground 3(A).

/ / / /

/ / / /

---

[1] According to the state corrections department's inmate locator page, Reed is incarcerated at Lovelock Correctional Center. The department's website reflects Nethanjah Breitenbach is the warden for that facility. Lovelock Correctional Center Facility | Nevada Department of Corrections (nv.gov). I therefore direct the clerk of the court to substitute Nethanjah Breitenbach for respondent Tim Garett under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] I previously dismissed grounds 4–7 and 3(B) of the petition. ECF Nos. 5; 23.

**I.    Background Summary[3]**

     **A.    Summary of the Prosecution's Case**

Multiple witnesses heard gunshots between 4:00 and 5:00 a.m. on March 19, 2012 in the vicinity of Van Patten, Lynwood, and Sahara streets in Las Vegas, Nevada.  The shots were fired into an apartment leased by Donzell Williams, also known as "Deuce."  Three people— Williams, Reed (also known as "E"), and Reed's girlfriend Genesis Figueroa—were inside but not injured and promptly left the apartment.  Police were aware that Williams used the apartment and had seen Reed and Williams together in a white van.  Outside Williams's apartment, police found 14 fired 9mm cartridge cases corresponding to shots that struck the apartment.

Three witnesses (Alvies, Hill, and Cortez) testified they were familiar with Reed and saw him shoot David Lemay the next morning only "a couple of hundred yards" from Williams's apartment.  The witnesses said Reed looked different at trial because he wore eyeglasses and no longer wore braided hair.  A fourth witness (Theus), who was also familiar with Reed, saw him holding a gun and heard gunfire but did not see the shooting.  A fifth witness (Chambers) was unfamiliar with Reed, did not see the shooting, and was only 25% certain she saw Reed drive the getaway van after she heard gunfire.  Lemay died of multiple gunshot wounds and Reed was apprehended after a lengthy, high-speed vehicle chase. *See infra* at pp. 2–6; ECF Nos. 3-34 at 43; 3-38 at 33–39, 48–57, 121–22, 130; 3-39 at 10–14, 21–22, 96, 106–16, 127–31, 144–50, 173–74, 184–91, 202–04, 216; 3-40 at 67; 3-41 at 7, 75.

/ / / /

/ / / /

---

[3] The background summary is based on the state court record, serves only as background to the issues presented in this case, and does not summarize all such material.  My failure to mention evidence does not mean I overlooked it.

B.    **Eyewitness Testimony**

John Alvies testified he saw Reed shoot Lemay on Lynwood in "broad daylight." Alvies grew up in the same neighborhood as Lemay and Lemay lived with Alvies's sister. Alvies also knew Williams, knew about his nearby apartment, was familiar with Reed for three or four months, and "quite often" saw Reed and Williams in a white van. Alvies heard the shots that were fired into Williams's apartment. Later that morning, Alvies was on Lynwood with Emmanuel Hill when he saw Reed, Williams, and a third unidentified person drive by in the white van. Alvies called Williams because Alvies knew "they were ticked off about getting shot at," and Alvies wanted to "make sure that [Williams] knew [Lemay] was [his] people," and "that by [Lemay] coming through the alley they didn't have no kind of misconception or, you know, mis-identity [sic] as to who shot at them." Alvies said Williams replied, "[f]or sure," but Reed emerged from an alley with an automatic pistol. Alvies yelled, "Hey, hey, hey . . . [t]hat's my people," and Lemay put up his hands. Alvies thought Reed told Lemay to go about his business, but as Lemay walked away, Alvies saw Reed shoot Lemay several times. Alvies ducked for cover and dialed 911.

Alvies initially told the police he did not know the shooter's identity, but changed his story later that day and told them it was Reed. Alvies had prior felony convictions for burglary, bank robbery, and assault with a deadly weapon in 2003. He claimed the State's payment of his hotel bill after the shooting did not affect the way he testified. Las Vegas Metropolitan Police Department (Metro) homicide detective Christopher O'Brien testified Alvies initially claimed he did not know the shooter. ECF Nos. 3-38 at 32–33, 41–69, 75, 98, 102–09, 115–24; 3-39 at 173–77, 180; 3-41 at 4–5.

1     Emmanuel Hill testified he was with Alvies when he saw Reed shoot Lemay.  Hill said

2  he and Alvies had been drinking and smoking marijuana at Alvies's apartment for three or four

3  days but were sober when he saw Reed, whom he "really never met" but whom he "spoke to . . .

4  a couple times," driving the white van with Williams.  At the preliminary hearing Hill testified,

5  "I seen two people in the front seat.  To my knowledge, if [Williams] wasn't driving, it had to be

6  [Reed]."  Hill saw Reed approach Lemay and pull out a gun.  Hill heard Lemay say "No," and

7  saw Reed shoot Lemay once or twice.  Hill ran away and heard five more gunshots.

8     Hill avoided the police for about a month.  He eventually told the police, "[Reed] did the

9  shooting that day" but that he did not hear any conversation between Lemay and Reed.  Hill did

10  not know the color of the shooter's clothes or whether he wore anything on his head.  Although

11  Hill expressed uncertainty, he identified Reed's photograph from a lineup array.  Hill identified

12  Reed as the shooter at a [preliminary] hearing, by referring to the defense table and stating, "that

13  brother right there."  Detective O'Brien testified police did not suggest Reed was the shooter

14  because Hill offered up the names of Williams and Reed before the police asked him questions.

15  O'Brien confirmed Hill expressed uncertainty whether or not the shooter was depicted in the

16  lineup array, but ultimately chose Reed's photograph.  Hill had felony convictions in 2003 for

17  attempted theft and in 1997 for aggravated assault.  ECF Nos. 3-39 at 8–16, 22–33, 40–61; 3-41

18  at 12–25.

19     Jamie Cortez testified she saw Reed shoot Lemay.  Cortez said Reed, whom she had met

20  before, picked her up in the van on Lynwood so she could purchase crack cocaine from

21  Williams.  After her purchase, she exited the van, and saw Reed wearing a hooded sweater, jump

22  out of the van, and take off running and shoot Lemay about three times.  She said Reed told her,

23  "Don't snitch, bitch," jumped in the van, and "abruptly" took off "fast."  She ran to Lemay and

stood beside him until the police arrived.  She said she lied when she initially told the police she "had never seen the suspect, never seen what happened" because she was "scared," and that she testified at trial for the purpose of identifying Reed as the shooter. ECF No. 3-39 at 129–47.

Marlania Theus testified she saw Reed with a gun just before the shooting, and heard gunfire, but did not see the shooting.  She lived at Williams's apartment and had known Reed for about six months.  She admitted she was a prostitute and that Williams, whom she called "Daddy," was her business partner and provided her protection.  She worked the night before Lemay's shooting and upon arriving home discovered multiple bullets had been shot into Williams's apartment.  She was a crack user and went to get some from Williams but saw Reed jump out of the passenger side of Williams's van with a gun.  She immediately returned to her apartment building because she "didn't want to know nothing."  She did not see the shooting but heard gunfire.  To protect Williams, she initially told police she knew nothing.  She later identified Reed in the photographic lineup array.  She said the detective "didn't say no names, no nothing," and "just showed [her] the picture and asked [her] to point out."  Two days before her trial testimony, a stranger "[d]rove up to [her] and told [her] if [she] testified that [she] was going to end up like David Lemay." *Id.* at 63–76, 79–89, 95–100.

Jessica Chambers testified she heard gunfire and saw a white van with three African Americans speed through the alley from Lynwood to Van Patten.  She said the driver of the van wore a hood, but she saw his facial features.  As he drove passed her, she stared at him, and he looked at her and asked, "What the fuck are you looking at?"  Eleven days later, she identified Reed's photograph in a six-pack photographic lineup array, as the one who looked the most like the driver, but she was only 25% certain. ECF No. 38-3 at 127–36.

1  Metro homicide detective Robert Rogers testified people in the area of the shooting

2  "typically don't want to get involved, out of fear for their own safety," and it is "normal" for

3  them not to offer up all information right away and offer it later.  He agreed witnesses may hear

4  things on the street and incorporate them into their beliefs.  Detective O'Brien likewise said,

5  "[i]n this kind of area, people are afraid . . . of being sought out or hurt" so "sometimes, it is

6  difficult to get people to share" what they witnessed. ECF Nos. 3-40 at 174; 3-41 at 78–79, 122.

7  ### C.    Apprehension and Forensic Evidence

8  The day after Lemay was killed, Metro officer Joseph Parra activated the lights and sirens

9  in his marked patrol vehicle and joined what turned out to be six-to-nine police vehicles chasing

10 Reed and Williams, who were in Figueroa's Camry.  Parra's vehicle was directly behind the

11 Camry as Reed drove down a congested freeway at about "80 to 100 miles per hour," "going in

12 and out of traffic," moving "to the left on the emergency lane and move all the way right to the

13 right side of the emergency lanes without signaling and cutting off other motorists . . . ."  Reed

14 exited the freeway into the opposite lane of traffic, travelling at speeds of 50 to 60 miles per hour

15 on side streets, with Parra behind him "the whole way."  Parra resorted to a "pit maneuver,"

16 whereby he tapped Reed's vehicle with the police vehicle, causing Reed's vehicle to spin, hit a

17 wall, and stop.  Reed and Williams were promptly apprehended.  Parra did not see anything

18 thrown from the Camry during the chase. ECF No. 3-40 at 49–62, 67–70.

19 Metro crime scene analyst Noelle Herring found an unfired bullet cartridge in the trunk of

20 the Camry and a black hooded jacket in the driver's seat.  Metro forensic scientist Jonathan Fried

21 concluded the unfired bullet cartridge from the Camry was the same design as two bullet

22 fragments recovered from Lemay's body.  Metro forensic scientists determined Reed's

23 fingerprints were on the white van's exterior driver's side door and interior rear passenger-side

1  window, and a piece of candy in the white van carried a major DNA profile consistent with

2  Reed. ECF Nos. 3-40 at 92–102, 128, 136–38, 151–54; 3-41 at 26–45, 53–70.

3       Detective Rogers confirmed Williams's cell phone called Alvies's cellphone around 6:00

4  a.m. on the morning of Lemay's shooting—between the time that Williams's apartment was shot

5  and Lemay's murder.  He confirmed Alvies's cellphone called Williams's cellphone just before

6  Lemay's murder.  He determined that four calls were made from Reed's cellphone just before

7  and after Lemay's murder, at 7:36, 7:58, 8:04, and 8:21 a.m.  The call at 7:36 a.m. used

8  cellphone towers 1.25 and 2.5 miles from the murder.  The call at 7:58 a.m. used a tower several

9  miles from the scene.  Reed's cellphone called Figueroa's at 8:04 a.m. and her phone called

10  Reed's at 8:21 a.m.  ECF No. 3-41 at 71, 78–79, 90–106, 118–23.

11       **D.    Summary of the Defense Case**

12       Reed testified he did not shoot Lemay and was not present when Lemay was shot.  He

13  testified that he, Figueroa, and Williams, were at Williams's apartment in the early morning of

14  March 19, 2012, when he heard a bang on the door.  He "looked out the blinds, saw somebody

15  way off to the alley, and they started shooting" but he could not identify the person.  After the

16  shooting stopped, he drove the van to Williams's other apartment on Sahara while Figueroa

17  followed them in her Camry.  Reed said he drove the van because he had a driver's license and

18  Williams did not. He and Figueroa then went to her apartment. ECF No. 3-34 at 89–102, 120–21.

19       Figueroa testified they were shocked when the shots were fired into Williams's

20  apartment.  She told the police that Reed and Williams were angry and wondering who fired the

21  shots.  At trial, she claimed there was no talk of retaliation.  She said she and Reed arrived at her

22  apartment at sunrise and Reed later left.  She gave the police various times for his departure,

23

1  including "8:00 or 9:00." At Reed's request, she disposed of a locked red metal box he left at

2  her apartment and did not know its contents. *Id.* at 37, 43–49, 57–88.

3      Reed's mother, Rita Fay Murray, testified she called Reed's cellphone before 8:00 a.m.,

4  on the morning of Lemay's murder, but Williams answered the call and told her Reed left his

5  cellphone in the van. Reed testified he was asleep at Figueroa's apartment until her cellphone

6  rang around 8:04 a.m. The ringtone for the call was the one Figueroa assigned to calls she

7  received from Reed's cellphone. Reed realized that Williams was calling Figuroa's phone using

8  Reed's cellphone because Reed left his phone in the van. Reed said he left to meet Williams at

9  the home of a mutual friend to retrieve his cellphone. Together with two others, Reed claimed

10 they had breakfast around "8:20, 8:30." Reed returned to Figueroa's apartment where he slept

11 until the next day. *Id.* at 19–21, 104–12.

12      Reed said he picked up Williams in Figueroa's Camry the next day because Williams

13 called him for a ride. After he picked up Williams, Reed realized numerous police cars were

14 following them but he "wasn't running for a murder"; rather, they tried to get away so Williams

15 "could get rid of" his drugs. He said Williams opened the packages and started "pouring them

16 out the window onto the . . . freeway." Once the police stopped his car, Reed said he exited,

17 walked a few steps, and got down on the ground as told. *Id.* at 112–19.

18      Reed testified he asked Figueroa to dispose of the metal box because he did not want her

19 to get into trouble for it. He said the box contained ecstasy pills, not a gun, and he kept it in a

20 compartment on Figueroa's patio. He did not know Lemay and did not know why a bullet

21 cartridge was in the Camry's trunk. ECF Nos. 3-34 at 102–03, 119–121; 3-35 at 20–21, 40–41.

22 / / / /

23 / / / /

1 | **II.      Antiterrorism and Effective Death Penalty Act**

2 | The Antiterrorism and Effective Death Penalty Act (AEDPA) provides:

3 | An application for a writ of habeas corpus on behalf of a person in custody pursuant to
   | the judgment of a State court shall not be granted with respect to any claim that was
4 | adjudicated on the merits in State court proceedings unless the adjudication of the
   | claim—

5 |
6 | (1)  resulted in a decision that was contrary to, or involved an unreasonable
   |      application of, clearly established Federal law, as determined by the Supreme
   |      Court of the United States; or

7 |
8 | (2)  resulted in a decision that was based on an unreasonable determination of the
   |      facts in light of the evidence presented in the State court proceeding provides
   |      an application for a writ of habeas corpus on behalf of a person in custody.

9 |

10 | 28 U.S.C. § 2254(d).

11 | A state court's decision is contrary to clearly established Supreme Court precedent within

12 | the meaning of 28 U.S.C. § 2254(d)(1) "if the state court applies a rule that contradicts the

13 | governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of

14 | facts that are materially indistinguishable from a decision of [the Supreme] Court and

15 | nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*,

16 | 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and

17 | citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court's decision is an unreasonable

18 | application of clearly established Supreme Court precedent within the meaning of 28 U.S.C.

19 | § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the

20 | Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

21 | case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The unreasonable application clause

22 | requires the state court decision to be more than incorrect or erroneous . . . . Rather, the state

23 | court's application of clearly established law must be objectively unreasonable." *Id.* (simplified).

9

1    A state court is not required to cite Supreme Court cases or even be aware of them, "so

2  long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v.*

3  *Packer*, 357 U.S. 3, 8 (2002).  The meaning of the phrase "clearly established Federal law in [28

4  U.S.C. § 2254(d)(1)] 'refers to the holdings, as opposed to the dicta, of the [Supreme] Court's

5  decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74

6  (2006) (quoting *Williams*, 529 U.S. at 412).  And "clearly established federal law, as determined

7  by the Supreme Court" does not include "state-court decisions." *Kernan v. Cuero*, 583 U.S. 1, 8

8  (2017).  Where no clearly established federal law, i.e., no holding from the Supreme Court, states

9  a particular standard or rule at the time of the state court decision, then, by definition, a petitioner

10  cannot establish under AEDPA that the state court's decision was either contrary to or an

11  unreasonable application of clearly established federal law. *Musladin*, 549 U.S. at 76–77.

12    "A state court's determination that a claim lacks merit precludes federal habeas relief so

13  long as 'fairminded jurists could disagree' on the correctness of the state court's

14  decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541

15  U.S. 652, 664 (2004)).  "Even a strong case for relief does not mean the state court's contrary

16  conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v.*

17  *Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*'s description of the standard as "a

18  'difficult-to-meet'" and "highly deferential standard for evaluating state-court rulings, which

19  demands state-court decisions be given the benefit of the doubt.") (internal and other citations

20  omitted).  The petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181 (citing

21  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

22  / / / /

23  / / / /

10

## III.    Discussion

### A.    Ground 1—Failure to Define "Material Element" for Instruction No. 33.

Reed alleges the state trial court violated his constitutional rights to due process, a fair trial, and equal protection, by giving Instruction No. 33 and refusing to give his alternative instructions based on NRS §§ 175.191 and 175.201.  Instruction 33 stated the presumption of innocence and "places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged . . . ." ECF No. 1 at 24.  Reed claims the instruction failed to define which elements are "material," so the jurors could speculate which elements were material and which were immaterial, thereby lessening the State's burden of proof. *Id.* at 23–33; ECF No. 44 at 7–9.  The respondents contend the state supreme court has held the phrase "material element" in the instruction does not signal to a jury that the State carries a lesser burden of proof than is required for any element or charged offense, and if erroneous, the instruction was harmless. ECF No. 40 at 8–12.

### 1.    Additional Background

The State proposed the following Instruction No. 33 concerning reasonable doubt:

> The Defendant is presumed innocent until the contrary is proved.  This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

> A reasonable doubt is one based on reason.  It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable must be actual, not mere possibility or speculation.

> If you have a reasonable doubt as to the guilt of the
> Defendant, he is entitled to a verdict of not guilty.

ECF Nos. 12-21 at 7; 3-42 at 35.

Reed filed a pretrial objection to the first paragraph of Instruction No. 33.  He argued that no instruction defined which elements are "material," and without such a definition the jurors could speculate which elements were material and which were not. ECF No. 12-21 at 7–11. Reed requested substitution of the following for the first paragraph of Instruction No. 33:

> Every person charged with the commission of a crime shall be presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt; and when an offense has been proved against the person, and there exists a reasonable doubt as to which of two or more degrees the person is guilty, the person shall be convicted only of the lowest.
>
> A defendant in a criminal action is presumed to be innocent until the contrary is proved; and in case of a reasonable doubt whether the defendant's guilt is satisfactorily shown, the defendant is entitled to be acquitted.

ECF Nos. 12-21 at 10–11; 3-43 at 11–12 (citing NRS §§ 175.191, 175.201).

At jury selection, the trial court informed the venire that the State would be required to prove beyond a reasonable doubt "all of the material elements" which the court would explain later. ECF No. 3-44 at 23.  At trial, the defense objected to Instruction No. 33 arguing it does not define the phrase "the material elements."  Counsel argued that, for the instruction to have meaning for the jury, "we have to articulate exactly what the material elements are."  The State argued "[i]t is for the jury to determine what the material elements are" and nothing required that they set out every material element.  The trial court overruled the objection, declined the defense proposed instructions because they "might confuse the jury," and gave the jury the State's proposed Instruction No. 33. ECF Nos. 3-35 at 56–57; 3-42 at 35.

1            **2.    Applicable Legal Principles**

2          A jury instruction "'may not be judged in isolation,'" rather it, "must be considered in the

3   context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72

4   (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  When reviewing instructions, a

5   court considers "'whether there is a reasonable likelihood the jury applied the instruction in a

6   way' that violates the Constitution." *Id.* at 72 n.4 (quoting *Boyde v. California*, 494 U.S. 370,

7   380 (1990) and acknowledging *Boyde* rejected the standard of *Cage v. Louisiana*, 498 U.S. 39

8   (1990), and settled on "the reasonable likelihood standard.").  It is insufficient that a juror "could

9   have" misinterpreted an instruction because the Supreme Court in *Estelle* "made clear that the

10  proper inquiry is not whether the instruction 'could have' been applied unconstitutionally, but

11  whether there is a reasonable likelihood that the jury *did* so apply it." *Tyler v. Cain*, 533 U.S.

12  656, 659 n.1 (2001) (emphasis in original).  If instructional error is found, a court must determine

13  whether the error "had a substantial and injurious effect or influence in determining the jury's

14  verdict." *Calderon v. Coleman*, 525 U.S. 141, 145–47 (1998) (citing *Brecht v. Abrahamson*, 507

15  U.S. 619, 637–38 (1993)).

16         "In state criminal trials, the Due Process Clause of the Fourteenth Amendment protects

17  the accused against conviction except upon proof beyond a reasonable doubt of every fact

18  necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364

19  (1970).  At the time of Reed's trial, the Supreme Court of Nevada had upheld instructions stating

20  that the State has a burden to prove "beyond a reasonable doubt every material element of the

21  crime charged" without specifying which elements were material. *Nunnery v. State*, 127 Nev.

22  749, 786, 263 P.3d 235, 259–60 (2011) (listing cases).

23

While Reed's direct appeal was pending in state court, the Supreme Court of Nevada ruled the "material elements" phrase in reasonable doubt instructions used in Nevada was "not so misleading or confusing" as to lessen the State's burden to prove the elements of the offenses where (1) the jury was instructed on "the elements of each of the offenses charged and the State had the burden to prove those elements," (2) "[n]o other instruction or any argument by the parties suggested that the State's burden on any element or offense was less than beyond a reasonable doubt," (3) there was no instruction telling the jury it could lessen the State's burden; and (4) the court was not convinced the phrase "material element" caused "the jury to speculate that it could choose which of the elements should be proven beyond a reasonable doubt and which ones need not be." *Burnside v. State*, 131 Nev. 371, 385–86, 352 P.3d 627, 637–38 (2015). The state supreme court concluded that, "[t]aking the instructions as a whole, they sufficiently conveyed to the jury that the State had the burden of proving beyond a reasonable doubt each element of the charged offenses and the phrase "material element" did not signal to the jury that the State carried a lesser burden of proof on any element or charged offense. *Id.* The court also ruled that the phrase "material elements" was "unnecessary" and should be omitted from future instructions. *Id.*

### 3.      State Supreme Court's Determination

The Supreme Court of Nevada determined the failure to define "material elements" and give Reed's alternative instructions were not error because the instructions, as a whole, conveyed the State's burden to prove beyond a reasonable doubt every element of the charged offenses:

> Reed contends that the district court erred by instructing the jury that the State bore the burden of proving beyond a reasonable doubt "every material element of the crime charged," rather than giving one of the instructions that he proposed. We conclude that the district court did not err, *see Nay v. State,* 123 Nev. 326, 330, 167 P.3d 430, 433 (2007) (reviewing whether a proffered

1

2

3

    instruction is a correct statement of the law de novo), because the
instructions given in this case, when taken as a whole, sufficiently
conveyed that the State had the burden of proving beyond a
reasonable doubt every element of the charged offense. *See
Burnside v. State,* 131 Nev., Adv. Op. 40 (2015).

4    ECF No. 3-12 at 2.

5        **4.      Analysis of Ground 1**

6        The state supreme court's determination of this issue is objectively reasonable. *Estelle*,

7    502 U.S. at 72.  In *Winship*, the Supreme Court held "[t]hat the Due Process Clause protects the

8    accused against conviction except upon proof beyond a reasonable doubt of every fact necessary

9    to constitute the crime with which he is charged. . . ." *Winship*, 397 U.S. at 364–65.  Reed's jury

10   was instructed that it must "not single out any certain sentence or any individual point or

11   instruction and ignore the others," but was required to "consider all the instructions as a whole

12   and regard each in the light of all the others." ECF No. 3-42 at 3.  The jury was instructed on the

13   facts and elements charged and those the State must prove beyond a reasonable doubt for each

14   offense. *Id.* at 3–31.  For example, the instructions stated, "[a]ll three elements—willfulness,

15   deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused

16   can be convicted of first-degree murder." *Id.* at 17.  The instructions repeatedly stated the jury

17   must find the defendant guilty beyond a reasonable doubt. *Id.* at 5, 10, 13, 21, 26–28, 33–36, 42.

18   And as in *Burnside*, no instruction, and none of the parties, conveyed to the jury that the State

19   had a lesser burden of proof or that the jury had the power to lessen that burden.  To the contrary,

20   in closing remarks, the prosecutor and defense counsel each acknowledged the State had the

21   burden to prove its case "beyond a reasonable doubt." ECF No. 3-36 at 11, 16, 37.  Defense

22   counsel also argued in closing that the State failed to prove the conspiracy offense beyond a

23   reasonable doubt, and the jury acquitted Reed of that charge. *Id.* at 16–18, 38.  Viewing the jury

1  instructions as a whole, fairminded jurists could determine there is no "reasonable likelihood"

2  the jury applied the "material elements" phrase in the reasonable doubt Instruction No. 33 in a

3  way that authorized it to decide the State was not required to prove each fact and element

4  required for the offenses beyond a reasonable doubt. *Estelle*, 502 U.S. at 74; *Harrington*, 562

5  U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas

6  relief so long as fairminded jurists could disagree on the correctness of the state court's

7  decision.") (simplified).

8       Reed argues the first paragraph of Instruction 33 containing the "material element"

9  phrase does not comport with state law under NRS §§ 175.191 and 175.201. He also argues his

10 proposed instructions in conformity with those statutes should have been given in lieu of the first

11 paragraph of Instruction 33 because the statutes provide a better definition of the concept. ECF

12 No. 1 at 26. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis

13 for habeas relief." *Estelle*, 502 U.S. at 71–72. The only permissible question in federal habeas is

14 "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

15 violates due process." *Id.* The Supreme Court of Nevada is the final arbiter of state law and

16 therefore I may not consider whether the failure to give Reed's alternative instructions was error

17 as a matter of state law.

18      Reed claims Instruction No. 33 is contrary to Supreme Court authority in *Cage* because it

19 allowed the jury to speculate which elements of the offenses were material and which were not.

20 As explained above, the Supreme Court overruled the standard in *Cage*, which required only a

21 showing that a jury *could* apply an ambiguous instruction in a way that violated the constitution,

22 and instead adopted the requirement that there be a "reasonable likelihood that the jury *did* so

23 apply it" in a way that violated the constitution. *See supra* at p. 12.

16

1    The Supreme Court of Nevada's determinations are neither contrary to nor constitute an

2  unreasonable application of clearly established federal law as determined by the Supreme Court

3  and are not based on unreasonable determinations of fact in light of the evidence presented in the

4  state-court proceeding.  I therefore must deny relief for Ground 1.

5    **B.**    **Ground 2—Failure to Give Instruction about Eyewitness Identification**

6    Reed alleges the trial court's rejection of proffered Jury Instruction No. 36, concerning

7  eyewitness identification evidence, violated  his rights to due process, equal protection, and a fair

8  trial.  He contends state court authority should be overruled, and the failure to give the proffered

9  instructions was contrary to *Perry v. New Hampshire*, 565 U.S. 228 (2012).  He argues that

10  omitting his proffered instructions was erroneous because he challenges the identification

11  procedure, the eyewitnesses had motives to blame Reed, and one eyewitness was only 25%

12  certain in her identification.  He argues correct identification of the shooter was affected by the

13  stress and trauma of the incident and failure to give the proffered instructions permitted the jury

14  to consider unreliable evidence without guidance. ECF Nos. 1 at 33–43; 44 at 9–11.

15    The respondents contend the Supreme Court of Nevada reasonably rejected this claim

16  and there was no error under *Perry* because Reed did not challenge the identification process and

17  two eyewitnesses (Alvies and Hill) were familiar with Reed and could identify him.  They

18  contend the instructions as a whole were proper, and no additional instructions were required to

19  ensure due process.  They contend that, even if the failure to give the proffered instructions was

20  error, Reed cannot show prejudice because three witnesses testified they saw him shoot Lemay

21  and multiple witnesses identified Reed as the driver of the getaway car. ECF No. 40 at 12–15.

22  / / / /

23  / / / /

17

1          **1.    Additional Background**

2          During jury selection, the trial court stated that when the jury considered witness

3    testimony, it may give that testimony "such weight and value as you believe the testimony of the

4    witness is entitled to receive," and "[m]ay take into consideration the appearance, attitude and

5    behavior of the witness, the interest of the witness in the outcome of the case, if any, the relation

6    of the witness to the Defendant or the State, the inclination of the witness to speak truthfully or

7    not, the probability or improbability of the witness's statements, and all of the facts and

8    circumstances in evidence." ECF No. 3-37 at 52–53.

9          At trial, Detective O'Brien testified he showed to the eyewitnesses six-pack photographic

10   lineup arrays that included Reed's photograph.  He did not know who prepared the lineup, but

11   the same array was shown to each witness.  O'Brien read to the jury the instructions he gave to

12   the witnesses before showing the witnesses the array, informing the witnesses that:

13         (1) the group of photographs that would be shown to the witness "may or may not contain

14   a picture of the person who committed the crime,"

15         (2) the fact that the photos were shown should not cause the witness to believe or guess

16   the guilty person was caught,

17         (3) the witness need not identify anyone and it is just as important to free innocent people

18   from suspicion as to identify the guilty;

19         (4) hairstyles, beards, and mustaches are easily changed and photographs do not always

20   depict the true complexion of a person as they may be lighter or darker than in the photograph;

21         (5) the witness should pay no attention to whether the photographs are black and white or

22   color or to any markings or numbers on the photographs;

23

1  (6) the witness should study only the person shown in each photograph, should not talk to

2  anyone other than police during the viewing, and must make up their mind without influence by

3  other witnesses;

4  (7) after viewing all of the photographs, tell the police whether or not the witness can

5  make an identification and in their own words how sure they are about the identification; and

6  (8) not to indicate in any way to other witnesses that they have or have not made an

7  identification.

8  O'Brien testified each witness signed the instructions indicating they understood the

9  instructions, he handed them the photographic lineup so they could "hold it and move it back and

10  forth," and the witnesses wrote down their findings on the instruction sheet. O'Brien denied

11  asking the eyewitnesses whether they recognized Reed and Williams in the lineups or ever

12  [suggesting or confirming a witness's identification] by pointing his "finger towards it," giving a

13  "little nod" or "a number or something to follow." ECF Nos. 3-40 at 174–75; 3-41 at 6–17.

14  Before the State's rebuttal case, the defense proposed instructions based on a New Jersey

15  state supreme court opinion that would have, among other things, instructed the jury to consider

16  the reliability of the eyewitness identifications based on: "stress, weapon focus, duration,

17  distance and lighting, witness characteristics, characteristics of the perpetrator, race bias,

18  opportunity to view, accuracy of their prior description of the perpetrator, their confidence and

19  accuracy, the time elapsed between the event and the identification, the degree of attention and

20  cross-racial effects." ECF Nos. 3-35 at 59–60; 3-43 at 17–30; *see also State v. Henderson*, 27

21  A.3d 872 (N.J. 2011). The proffered instructions would have also directed the jury to evaluate

22  the suggestiveness of the lineup and the resulting reliability of the identifications based on:

23  lineup composition, number of individuals in the lineup, number of times the witness viewed the

lineup, whether the lineup was double-blind (where the officer showing the lineup array to the witness does not know the identity of the suspect), whether law enforcement instructed the witness that the perpetrator may not be in the lineup, or communicated the defendant's photograph was that of the suspect or gave feedback that confirmed the witness's selection of the suspect in the array.  The instructions would have directed the jury to consider a witness's exposure to opinion, descriptions, or identifications of others. ECF No. 3-43 at 17–30.

Defense counsel argued the proffered instructions were relevant because they addressed the reliability of cross-racial identifications, and it appeared that Theus was from a race different than the shooter.  The State countered that "[t]his isn't one of those typical eyewitness identification cases where nobody knew who the defendant was" because, aside from Chambers, everyone knew Reed before they saw him commit the murder.  The State also argued that the Supreme Court of Nevada held in *Nevius vs. State*, 101 Nev. 238 (1985), "that specific eyewitness identification instructions need not be given," as they duplicate the general instructions on credibility of witnesses.  The trial court rejected Reed's proffered instructions, indicating all of the eyewitnesses except Chambers had prior familiarity with Reed. ECF No. 3-35 at 60–61.

The trial court instructed the jury about its evaluation of witness credibility:

> The credibility or believability of a witness should be determined by his manner upon the stand, his relationship to the parties, his fears, motives, interests or feelings, his opportunity to have observed the matter to which he testified, the reasonableness of his statements and the strength or weakness of his recollections.
>
> If you believe that a witness has lied about any material fact in the case, you may disregard the entire testimony of that witness or any portion of his testimony which is not proved by other evidence.

The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness' credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness.

ECF No. 3-42 at 38, 40. In closing argument, the prosecutor reviewed Instruction No. 36 with the jury while arguing the eyewitness identifications of Reed were credible and other evidence corroborated their testimony. ECF No. 3-35 at 96–105.

The defense argued in closing that the identifications lacked credibility, claiming the police procedure was suggestive because an identical lineup array was shown to every eyewitness. Counsel argued the lineup was particularly suggestive for Hill's identification because during his interview with the detectives, Hill initially and repeatedly failed to identify anyone in the lineup array that contained Reed's photograph, and the interview transcript indicated the detective asked Hill to return to him the lineup "with E in it." Counsel argued the detective suggested Reed was in the array, which paved the way for Hill's identification of Reed at the defense table at the preliminary hearing and later at trial. The defense argued the eyewitnesses who had relationships with Williams lacked credibility because of their biases. The defense pointed out Theus—who said she saw Reed (with whom she was familiar) with a firearm and heard shots fired, but did not witness the shooting—called Williams "Daddy," and relied on him for protection because she was a prostitute. Counsel argued Theus was motivated to identify Reed because she did not want Williams "to get any heat from this." Counsel argued Alvies lacked credibility because he was "buddies" with Williams, and initially denied knowing the shooter's identity. Counsel argued it was easy for Alvies to point the finger at Reed because Reed was new to the neighborhood. Counsel argued Alvies was not scared to testify but instead took advantage of the free hotel provided by the State, and that Hill likewise wanted to testify

21

1    only to obtain a free hotel room.  The defense argued the eyewitness's lacked credibility because

2    their claims of sobriety at the time of the shooting lack credibility: Theus and Cortez were

3    admitted crack users, and Alvies and Hill had been using marijuana and alcohol for three days

4    before the shooting.  Counsel argued Cortez lacked credibility about her identification of Reed

5    because she initially told the police she wasn't present at the shooting but a year later identified

6    Reed.  The defense argued the "stress" of witnessing the shooting affected the ability to recall

7    observations made during that event. ECF No. 3-36 at 20–27, 30–32.

8             **2.    State Supreme Court Determinations**

9             The Supreme Court of Nevada determined Reed's proffered eyewitness identification

10   instructions were not required because the central issue at trial was the credibility of the

11   eyewitnesses, not their capacities to observe the shooter, and the jury was properly instructed

12   regarding factors it should consider when evaluating witness testimony:

13                    [R]eed contends that the district court abused its discretion
                by declining to give one of his proposed instructions regarding
14              eyewitness identifications.  We disagree.  The jury was properly
                instructed regarding the factors it should consider when evaluating
15              a witness' testimony.  More specific instructions were not required,
                particularly when the central issue in the case was the credibility of
16              the eyewitnesses rather than their capacity to observe. *See Lee v.
                State*, 107 Nev. 507, 509, 813 P.2d 1010, 1011 (1991) (holding
17              that eyewitness identification instructions "might be called for" in
                certain circumstances, but need not be given where the strength of
18              an identification was overwhelming).  Accordingly, we conclude
                that the district court did not abuse its discretion. *See Nay*, 123
19              Nev. at 330, 167 P.3d at 433 (reviewing a district court's refusal to
                give a jury instruction for an abuse of discretion).

20

21                    [FN 1] We decline Reed's request to overrule our
                prior decisions regarding specific eyewitness
                identification instructions.
22   ECF No. 3-12 at 2–3.

23   / / / /

1          3.        **Analysis of Ground 2**

2          Reed contends the failure to give the proffered instructions was contrary to the Supreme

3    Court's decision in *Perry*, claiming *Perry* held that juries should be given specific instructions

4    concerning the factors to consider in determining the reliability of eyewitness identification. ECF

5    Nos. 1 at 33–43; 44 at 9–11.  I disagree.  The Supreme Court of Nevada's determination is

6    neither contrary to nor constitutes an unreasonable application of federal law, including *Perry*.

7          In *Perry* an eyewitness saw someone break into vehicles in the middle of the night. 565

8    U.S. at 234–35.  During a police interview, the eyewitness pointed through a window at the

9    defendant, whom police had detained in the parking lot, identifying him as the perpetrator. *Id.*  A

10   month later, the eyewitness did not identify the defendant in a lineup array. *Id.*  The defense's

11   motion to suppress the out-of-court identification as an unreliable product of a suggestive show-

12   up in violation of due process was denied. *Id.*  The Supreme Court granted certiorari in *Perry* "to

13   resolve a division of opinion on the question whether the Due Process Clause requires a trial

14   judge to conduct a preliminary assessment of the reliability of an eyewitness identification made

15   under suggestive circumstances not arranged by the police." *Id.* at 236.  The Supreme Court

16   explained that "the reliability of relevant testimony typically falls within the province of the

17   jury," but it had recognized an additional "due process check on the admission of eyewitness

18   identification, applicable when the police have arranged suggestive circumstances leading the

19   witness to identify a particular person as the perpetrator of a crime." *Id.* at 232.  The Court held

20   that where no improper law enforcement activity is involved, as in that case, "it suffices to test

21   reliability through the rights and opportunities generally designed for that purpose, notably, the

22   presence of counsel at post indictment lineups, vigorous cross-examination, protective rules of

23

23

1 evidence, and jury instructions on both the fallibility of eyewitness identification and the

2 requirement that guilt be proved beyond a reasonable doubt." *Id.* at 233.

3      Although *Perry* approved of jury instructions about the fallibility of eyewitness

4 identification as one safeguard against unreliable identification, nothing in *Perry* mandates or

5 clearly establishes that eyewitness-specific instructions are a requirement of federal due process.

6 The language in *Perry* that Reed relies on is, at best, dictum, which is insufficient to warrant

7 federal habeas relief. *Williams,* 529 U.S. at 412.

8      Reed asks me to overrule the Supreme Court of Nevada's holding in *Nevius*.  But claims

9 of error in state jury instructions are generally a matter of state law.  Only a deprivation of due

10 process may be asserted in federal habeas proceedings, and a violation of due process occurs if a

11 trial is fundamentally unfair. *Estelle,* 502 U.S. at 72–73.

12      A defendant's right to due process is protected when the jury instructions adequately

13 convey the defendant's theory of the case. *See United States v. Romm*, 455 F.3d 990, 1002 (9th

14 Cir. 2006).  Because the omission of an instruction is less likely to be prejudicial than a

15 misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular

16 instruction bears an especially heavy burden. *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

17      The Supreme Court of Nevada reasonably determined that the failure to administer

18 Reed's proffered instructions was not fundamentally unfair and did not violate federal due

19 process.  The state court's record supports the determination that no further instructions beyond

20 those given were necessary because the central dispute was the credibility of the eyewitnesses

21 and the trial court's instructions directed the jury to consider their credibility.  Moreover, the

22 record shows that, as part of Reed's alibi defense, Reed was able to fully cross-examine the

23 witnesses and argue their lack of credibility.

Four witnesses—Alvies, Hill, Reed, and Theus—were familiar with Reed, having seen him on prior occasions in the company of Williams. Theus, who was familiar with Reed, saw Reed with a firearm and heard gunfire, but did not see the shooting. The other three witnesses— Alvies, Cortez, and Hill—each claimed prior familiarity with Reed, and testified they saw Reed shoot Lemay. None of those witnesses stated that they could not identify the shooter; rather, they stated they initially chose not to identify the shooter. Alvies admitted he did not initially identify Reed as the shooter but later told the police that same day that Reed was the shooter because he had told his sister and his sister, in turn, told the police. Cortez testified she did not initially identify Reed because she was afraid after he told her not to "snitch." Hill testified he hid from police for a month, but eventually met with them and immediately told them Reed was the shooter before attempting to identify Reed in the lineup array and admitted he was unsure whether the photograph in the lineup depicted Reed. Theus, who said she saw Reed with a gun but did not see the shooting, admitted she initially told police she knew nothing because she wanted to protect Williams. Two homicide detectives testified it was not unusual for witnesses in that neighborhood to initially withhold information from police.

Defense counsel argued these identifications lacked credibility due to their relationships with Williams, possible biases and motives, prior felony convictions, drug use, and delayed identification of Reed. The jury was instructed to consider the witnesses' manners on the stand, relationship to the parties, fears, motives, interests or feelings, opportunity to observe the matter, the reasonableness of their statements and the strength or weakness of their recollections.

A fifth witness, Chambers, had no prior familiarity with Reed, but did not see the shooting; she only heard shots fired. Chambers identified Reed as the driver of the getaway van and was only 25% certain about her identification. Defense counsel had the opportunity to fully

1  cross-examine Chambers about her identification and later argued in closing that Chambers

2  admitted she was only 25% certain about her identification of Reed as the driver.  The jury was

3  instructed to consider a witness's "opportunity to have observed the matter."

4       Given the state court's record, it was reasonable to conclude the instructions given

5  adequately conveyed the defendant's theory of the case and Reed's proffered instructions were

6  not necessary.  The state supreme court's determinations are neither contrary to, nor constitute an

7  unreasonable application of, clearly established federal law as determined by the Supreme Court

8  and are not based on unreasonable determinations of fact in light of the evidence presented at

9  trial.  Therefore, I must deny federal habeas relief for Ground 2.

10      **C.    Ground 3(A)—Failure to Object that Oath not Administered to Venire**

11      Reed contends he was denied the effective assistance of trial counsel in violation of the

12 Sixth and Fourteenth Amendments when counsel failed to object to the trial court's failure to

13 administer the oath of truthfulness to the venire, as required by NRS § 16.030(5).  He argues

14 counsel's error rendered the trial fundamentally unfair because the prospective jurors were not

15 obligated to respond truthfully to questions in voir dire that were designed to determine whether

16 they could be fair and impartial jurors.  He claims counsel's failure to object to the omission

17 constitutes deficient performance, and he need not show prejudice because the error is structural.

18 Reed alternatively claims counsel's error was prejudicial because it limited his ability to raise the

19 issue on direct appeal, where his conviction would have been reversed because, as structural

20 error, he would not be obligated to demonstrate prejudice.  The respondents contend the state

21 supreme court's rejection of this claim is reasonable as Reed fails to show a reasonable

22 probability the result of the trial would be different, but for counsel's error. ECF Nos. 1 at 47–63;

23 40 at 15–21; 44 at 2–7.

1          **1.    Additional Background**

2          At jury selection, the trial court informed the venire: "[i]f you have any communication

3  that you want to make with the Court . . . we ask for truthful answers" and stated the intent [of

4  questions during jury selection] was to obtain a "jury that is fair and impartial" to both parties.

5  ECF No. 3-44 at 3–4, 15–16.  The trial court (and counsel) informed the jury, and individual

6  jurors, that the purpose of the questions was to obtain a jury composed of "people that are fair

7  and impartial to both sides," and requested the venire "be honest" about whether they had travel

8  plans that would prevent them from serving as jurors. *See, e.g.*, *id.* at 20, 23, 25, 49–53, 57–58,

9  67–68, 81, 83, 90, 100–01, 105, 118, 128, 131, 135, 141, 146–47, 152, 155, 164, 171–72; *see*

10  *also* ECF No. 3-45 at 49.  The record does not reflect the administration of an oath to the venire

11  affirming that their responses to questions during jury selection would be truthful.  An oath was,

12  however, administered to the presiding jury. ECF No. 3-38 at 13.

13          At the state postconviction evidentiary hearing, trial counsel testified he relies on

14  prospective jurors to provide truthful answers to questions so he can assess whether they are fair

15  and impartial.  Counsel said it is hard to prove a juror is lying and he determines their veracity

16  the same way he determines the veracity of a potential witness who is not under oath, i.e., "you

17  just try to dig in a little and see what you find out" and determine "whether or not the answer

18  comports with their demeanor," whether "there are any conflicts with the facts, whether they

19  look away from you," and "normal cues that somebody is not telling you the truth."  Counsel

20  said he relies on the oath and penalties of perjury as incentives to provide truthful answers but

21  did not notice the trial court failed to administer the oath, and admitted his failure to object was

22  not a strategic decision.  Counsel received no information about juror misconduct, bias, or

23  impartiality in Reed's case. ECF No. 3-25 at 30–35, 37, 43–44, 50.

1        **2.    Applicable Legal Principles**

2            **a.    Standards for Evaluating Effective-Assistance-of-Counsel**

3    A petitioner claiming ineffective assistance of counsel (IAC) must demonstrate (1) the

4  attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the

5  attorney's deficient performance prejudiced the petitioner such that "there is a reasonable

6  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

7  been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).  "A reasonable

8  probability is a probability sufficient to undermine confidence in the outcome." *Id.*

9            In considering an IAC claim, a court "must indulge a strong presumption that counsel's

10  conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  On the

11  performance prong, the issue is not what counsel might have done differently but whether

12  counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90.  A

13  petitioner must show "counsel made errors so serious that counsel was not functioning as the

14  'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

15           To establish prejudice, it is not enough for the petitioner "to show that the errors had

16  some conceivable effect on the outcome of the proceeding." *Id.* at 693.  The errors must be "so

17  serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  The

18  *Strickland* "prejudice inquiry is not meant to be applied in a 'mechanical' fashion[;]" rather, "the

19  ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" *Weaver v.*

20  *Massachusetts*, 582 U.S. 286, 300 (2017) (quoting *Strickland*, 466 U.S. at 696).

21           "Establishing that a state court's application of *Strickland* was unreasonable under

22  § 2254(d) is all the more difficult" as "[t]he standards created by *Strickland* and § 2254(d) are

23  both 'highly deferential,'" and applied in tandem, "review is 'doubly so.'" *See Richter*, 562 U.S

1  at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.

2  2010) (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

3    **b.    Applicable Principles Concerning Jury Selection**

4      The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy

5  the right to a speedy and public trial, by an impartial jury of the State and district wherein the

6  crime shall have been committed . . . ." U.S. Const. amend. VI.  Absent indications to the

7  contrary, jurors are presumed impartial. *See Murphy v. Florida*, 421 U.S. 794, 800 (1975)

8  (recognizing "'the presumption of a prospective juror's impartiality'" (quoting *Irvin v. Dowd*,

9  366 U.S. 717, 722 (1961))); *cf. Green v. White*, 232 F.3d 671, 677–78 (9th Cir. 2000)

10  (presumption jury is unbiased overcome when juror repeatedly lied during voir dire to obtain seat

11  on the jury and otherwise revealed his partiality).

12      "A fair trial in a fair tribunal is also a basic requirement of due process." *In re Murchison*,

13  349 U.S. 133, 136 (1955).  The due process right to a competent and impartial tribunal is

14  separate from the right to any particular form of proceeding and includes due process limitations

15  on the composition of a jury. *See Peters v. Kiff*, 407 U.S. 493, 501, 504–05 (1972) (holding

16  "whatever his race, a criminal defendant has standing to challenge the system used to select his

17  grand and petit jury, on the ground that it arbitrarily excludes from service the members of any

18  race, and thereby denies him due process of law.").

19      The Constitution guarantees an adequate voir dire to identify unqualified jurors because

20  "[*v*]*oir dire* plays a critical function in assuring the criminal defendant that his [constitutional]

21  right to an impartial jury will be honored" and "[w]ithout an adequate *voir dire* the trial judge's

22  responsibility to remove prospective jurors who will not be able impartially to follow the court's

23  instructions and evaluate the evidence cannot be fulfilled." *Morgan v. Illinois,* 504 U.S. 719,

729–30 (1992) ("[t]he Constitution . . . does not dictate a catechism for *voir dire* but only that the

defendant be afforded an impartial jury"); *see also Mu'min v. Virginia,* 500 U.S. 415, 427

431(1991).  Absent a "special circumstance," a "generalized but thorough inquiry into the

impartiality of the veniremen" will satisfy the demands of due process. *Ristaino v. Ross,* 424

U.S. 589, 598 (1976).[4]

In Nevada, a trial court is statutorily required to administer an oath of truthfulness to

prospective jurors before examination about their qualifications to serve as jurors:

> Before persons whose names have been drawn are examined as to
> their qualifications to serve as jurors, the judge or the judge's clerk
> shall administer an oath or affirmation to them in substantially the
> following form:
>
> > Do you, and each of you, (solemnly swear, or affirm
> > under the pains and penalties of perjury) that you
> > will well and truly answer all questions put to you
> > touching upon your qualifications to serve as jurors
> > in the case now pending before this court (so help
> > you God)?

NRS § 16.030(5).

The Supreme Court of Nevada, persuaded by the reasoning in, among other cases, *Kiff,*

407 U.S. at 498–505, held on direct appeal of an objection preserved at trial, that a Nevada trial

court's failure to administer the truthfulness oath prescribed by NRS § 16.030(5) constitutes a

structural denial of due process because it failed to "strictly comport with the laws intended to

---

[4] While not providing binding precedent over this claim, I note that other federal district courts have rejected claims that the constitution was violated by a state trial court's failure to administer an oath of truthfulness to a venire. *See, e.g., Carter v. Chappell,* CV 06-4532, 2013 WL 781910, at *51 (C.D. Cal. Mar. 1, 2013); *Theard v. Artus*, No. CV 09-5702, 2012 WL 4756070, at *12 (E.D.N.Y. Aug 27, 2012) ("[W]hether the trial court administered the jury truthfulness oath . . . is a state law issue for which habeas relief is unavailable"); *Robertson v. McKee*, No. CV 09-14675, 2012 WL 263099, at *4 (E.D.Mich. Jan. 30, 2012).

1 preserve the integrity of the judicial process." *Barral v. State*, 131 Nev. 520, 525, 353 P.3d 1197,

2 1200 (2015).[5]

3           **c.**      **Evaluation of IAC for Failure to Object to Structural Error**

4       Structural errors are those that "affect[ ] the framework within which the trial proceeds,

5 rather than being simply an error in the trial process itself." *Weaver*, 582 U.S. at 295 (internal

6 quotation marks and citation omitted). Structural errors are found in a "very limited class of

7 cases," *Johnson v. United States*, 520 U.S. 461, 468–69 (1997) (listing cases). "The purpose of

8 the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that

9 should define the framework of any criminal trial," *Weaver*, 582 U.S. at 295.

10       In *Weaver*, the Supreme Court considered whether to apply *per se* structural error or

11 *Strickland*'s prejudice standard to a claim that trial counsel was ineffective in failing to object to

12 a state trial court's commission of structural error in closing the courtroom to the public, in

13 contravention of the Court's holding in *Presley v. Georgia*.[6] *Id.* at 290–94. Some lower courts

14 held a defendant was entitled to a new trial when such a structural error was neither preserved

15 nor raised on direct review but instead raised as an IAC claim, while other courts held a

16 defendant in such instances was entitled to relief only upon showing prejudice under *Strickland*.

17 *Id.* at 293–94, 299–300.

18       In *Weaver*, the Supreme Court explained that structural error typically comes in three

19 flavors. *Id.* at 295. First, there are some instances where "[t]he right at issue is not designed to

20 protect the defendant from erroneous conviction but instead protects some other interest." *Id.*

21 Second, "an error has been deemed structural if the effects of the error are simply too hard to

22 _____

23 [5] The decision in *Barral* was handed down two days after the affirmance of Reed's judgment on direct appeal.

[6] 558 U.S. 209, 291 (2010).

1  measure." *Id.*  And third, "an error has been deemed structural if the error always results in

2  fundamental unfairness." *Id.*  The Court cautioned these categories are not rigid, more than one

3  rationale may explain why an error is deemed structural, and an error can be considered

4  structural even if the error does not lead to fundamental unfairness in every case. *Id.*

5      The *Weaver* Court observed that, "when a defendant objects to a courtroom closure, the

6  trial court can either order the courtroom opened or explain the reasons for keeping it closed." *Id.*

7  at 302.  "When a defendant first raises the closure in an ineffective-assistance claim, however,

8  the trial court is deprived of the chance to cure the violation either by opening the courtroom or

9  by explaining the reasons for closure." *Id.*  The Court explained that differences in time elapsed,

10 costs, and other consequences of the two paths for raising a claim of relief "justify a different

11 standard for evaluating a structural error depending on whether it is raised on direct review or

12 raised instead in a claim alleging ineffective assistance of counsel." *Id.* at 302–03.

13     In *Weaver*, the Supreme Court ultimately rejected a structural error approach to the court-

14 closure claim raised via IAC, and instead applied the *Strickland* prejudice prong, holding: "when

15 a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, . . . the

16 burden is on the defendant to show either a reasonable probability of a different outcome in his

17 or her case or . . . to show that the particular public-trial violation was so serious as to render his

18 or her trial fundamentally unfair." *Id.* at 300–01, 304–05.  The decision in *Weaver* was made

19 "specifically and only in the context of trial counsel's failure to object to the closure of the

20 courtroom during jury selection." *Id.* at 294.  The Supreme Court expressly stated its decision in

21 *Weaver* did not address the question whether its prior holdings of automatic reversal for

22 instances of structural error for claims alleging race or gender discrimination in the selection of

23

1 the petit jury, which were raised in direct review proceedings, would be any different if such

2 errors were raised instead in an IAC claim on collateral review. *Id.* at 301–02.

### 3.    State Supreme Court's Determinations

In Reed's initial appeal from the denial of his state postconviction petition, the Supreme

Court of Nevada, affirmed in part, reversed in part, and remanded to the state district court for a

determination whether Reed could demonstrate he was prejudiced by trial counsel's failure to

object to the trial court's omission of the oath of truthfulness to the venire:

> Reed contends that counsel should have objected when the trial
> court failed to swear in the jury before voir dire pursuant to NRS
> 16.030(5), which constitutes structural error pursuant to *Barral v.*
> *State*, 131 Nev., Adv. Op. 52, 353 P.3d 1197, 1200 (2015). The
> district court denied this claim without conducting an evidentiary
> hearing, reasoning that this court did not announce the *Barral*
> decision until after Reed's trial and counsel could not have
> anticipated it. We disagree because although counsel did not have
> the benefit of *Barral*, counsel could have objected pursuant to NRS
> 16.030(5). We therefore reverse the district court's order as it
> relates to this claim only and remand for the district court to
> consider in the first instance whether Reed can demonstrate
> deficient performance and prejudice.
>
> > [FN 2] The United States Supreme Court
> > recently held that a petitioner raising an ineffective-
> > assistance-of-counsel claim based on his attorney's
> > failure to preserve a structural error must
> > demonstrate prejudice. *See Weaver v.*
> > *Massachusetts*, 137 S. Ct. 1899, 1912–13 (2017).

ECF No. 3-20 at 2–3.

On remand, the state district court conducted an evidentiary hearing and denied the claim.

On appeal, the Supreme Court of Nevada applied *Strickland*, based on the holding in *Weaver*,

and determined Reed demonstrated neither a reasonable probability of a different outcome nor

fundamental unfairness:

33

To demonstrate ineffective assistance of trial counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). The petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004), and both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697. We defer to the district court's factual findings that are supported by substantial evidence and not clearly wrong, but review its application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

Reed argues that trial counsel should have objected when the trial court failed to administer the jury oath required by NRS 16.030(5), which constitutes structural error pursuant to *Barral v. State*, 131 Nev. 520, 525, 353 P.3d 1197, 1200 (2015). While structural errors generally warrant automatic reversal when the issue was preserved at trial and raised on direct appeal, a petitioner raising an ineffective-assistance-of-counsel claim based on trial counsel's failure to preserve a structural error must demonstrate prejudice. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017); *see also id.* at 1911 (analyzing whether prejudice was established by showing either a reasonable probability of a different outcome or fundamental unfairness). Substantial evidence supports the district court's findings that there were no abnormalities in the juror selection process; that both parties thoroughly examined the prospective jurors, who were repeatedly asked if they could be fair and impartial; and that trial counsel testified that, had the oath been administered, he would have questioned the prospective jurors the same way and selected the same jurors. Further, Reed does not allege any evidence of bias or partiality regarding any juror who was impaneled. *Cf. Wesley v. State*, 112 Nev. 503, 511, 916 P.2d 793, 799 (1996) (concluding that defendant is not entitled to relief from limitation of voir dire if impaneled jury is impartial). Accordingly, Reed has shown neither a reasonable probability of a different outcome based on counsel's omission nor fundamental unfairness. *See Weaver*, 137 S. Ct. at 1913 (finding no fundamental unfairness where there was "no suggestion that any juror lied during *voir dire*; no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and

serious purpose that our system demands").[1]  The district court therefore did not err in denying this claim.

> [FN 1] *Weaver* further observed that the trial court was deprived of the opportunity to cure its error when a petitioner first challenges a courtroom closure in an ineffective-assistance claim. 137 S. Ct. at 1912.

ECF No. 3-32 at 2–4.

### 4.    Analysis of Ground 3(A)

#### a.    Failure to Apply Structural Error

Reed contends the state supreme court's determination is unreasonable because this claim is not subject to *Strickland* prejudice, and instead falls within the second classification of structural error discussed by the Supreme Court in *Weaver*, i.e., that the effects of the error are too hard to measure, making it impossible to determine whether the error was harmless. ECF No. 1 at 54–55 (citing *Weaver*, 582 U.S. at 295–96 and *Kiff*, 407 U.S. at 501–04).

Neither of the holdings in *Weaver* and *Kiff* constitutes clearly established federal law as determined by the Supreme Court that an IAC claim for failure to object to the administration of the truthfulness oath to a venire before jury selection is a rare instance warranting the application of structural error in lieu of the application of *Strickland*'s prejudice prong. As discussed, the Supreme Court in *Weaver* confined its decision to "the context of trial counsel's failure to object to the closure of the courtroom during jury selection." *See supra* at pp. 30–32.  Even were I to assume *Weaver* is applicable to Reed's IAC claim, the Supreme Court in *Weaver* rejected a structural error approach to an IAC claim and instead applied the *Strickland* prejudice standard. Although the Supreme Court in *Weaver* discussed three types of structural errors found in prior cases, that discussion does not constitute clearly established federal law for purposes of the IAC

1  claim here.  Reed's contention that he is entitled to automatic relief for counsel's deficient

2  performance in failing to object to structural error under the authorities that the Supreme Court

3  of Nevada relied upon for its decision in *Barral*, namely *Kiff*, is unpersuasive.  In *Kiff*, the

4  Supreme Court did not address the prejudice analysis for an IAC claim for failure to object to

5  structural error because the petitioner in that case did not raise an IAC claim.  *Barral* likewise

6  concerned a preserved claim of error raised on direct appeal, not a claim, as here, that trial

7  counsel provided ineffective assistance.  The decision in *Barral* did not rely on any Supreme

8  Court cases addressing the prejudice standard for claims that trial counsel failed to object to

9  structural error.

10  Reed cites no clearly established federal law as determined by the Supreme Court

11  requiring the application of per se prejudice to an IAC claim for failing to administer a

12  truthfulness oath to a venire.  Thus, I must find the Supreme Court of Nevada's failure to apply

13  structural error to Reed's IAC claim is neither contrary to nor an unreasonable application of

14  clearly established federal law under Supreme Court precedent. *See Musladin*, 549 U.S. at 76.

15  **b.    Application of *Strickland* Prejudice**

16  The Supreme Court of Nevada correctly identified and reasonably applied *Strickland* as

17  the governing legal principle for Reed's claim.  Moreover, that court's determinations are not an

18  unreasonable application that principle to Reed's claim. *Pinholster*, 563 U.S. at 182 ("If the

19  state-court decision 'identifies the correct governing legal principle' in existence at the time, a

20  federal court must assess whether the decision 'unreasonably applies that principle to the facts of

21  the prisoner's case.'") (citing *Williams*, 529 U.S. at 413).

22  Despite the failure of Reed's trial court to administer the truthfulness oath to the venire

23  and trial counsel's failure to object to the omission, it was not unreasonable for the Supreme

1    Court of Nevada to conclude there was no reasonable probability the result of the trial would

2    have been different but for counsel's failure to object to the omission of the oath.  At the outset

3    of jury selection, the trial court told the venire, "we ask for truthful answers" and explained the

4    objective was to obtain fair and impartial jurors.  The attorneys and the court thereafter subjected

5    the venire to extensive questioning, including appeals to their honesty and candor.

6            Several instances of open expressions of candor and honesty illustrate the venire was

7    aware of and honored requests for truthful responses during voir dire.  Prospective juror 11 said,

8    "[i]n all honesty" she was more likely to believe a police officer than a lay witness, it would be

9    extremely difficult for her not to take the testimony of Metro officers "at face value" due to her

10   work for Medic West Ambulance, and she did not think that "would be fair to the defendant."

11   Prospective juror 16 stated "honesty's the best policy," and he "was being" honest about his prior

12   bad experiences with law enforcement and admitted he previously "screwed up" when he was

13   charged with petty theft, but he would nonetheless be a fair and impartial juror.  Prospective

14   juror 17 said she told "the truth" about her desire not to serve on the jury because of the

15   difficulty it created at her job, but if she served, she could be a fair and impartial juror.

16   Prospective juror 18 said she responded "truthfully" about her reluctance to serve as a juror

17   because of her life experiences.  Prospective juror 21 repeatedly stated she was "honest" in her

18   responses, and counsel asked her, "[c]an you tell me the truth right now that you'd be fair and

19   impartial juror," and she confirmed she could do so.  Prospective juror 47 stated he was being

20   "honest" in response to questions during voir dire and could be fair and impartial.  Prospective

21   juror 49 stated he was being "honest" with himself about his concerns over whether he could be

22   fair and honest in this particular case because his son had been shot to death.  As Reed concedes,

23

this and other candor led to dismissal of various members of the venire. ECF Nos. 1 at 58–59; 3-37 at 71–73, 92–93; 3-44 at 50, 54–56, 65, 67, 120–30, 161–75; 3-45 at 4–17.

Similarly, the trial record illustrates that the jurors who ultimately served on the jury provided revealing responses about their potential biases during voir dire and the parties were permitted to uncover and explore those biases. Juror 7 had a problem with the death penalty (which was not at issue in this case) and might have to work at night after serving on the jury. Juror 14 was interested in law enforcement, his grandfather was a Metro "bike cop," and his father was a federal employee whose gun was stolen and the thief never found. Juror 15 was an attorney who previously represented law enforcement employees in human resources matters during administrative hearings, and his uncle was a New Jersey police officer. Juror 17 was previously foreman on a jury and did not wish to serve on this jury because of the consequences to her work. Juror 20 had visited her late father while he was incarcerated, and she was concerned about seeing autopsy photographs. Juror 29 was a victim of two individuals who stole an iPod and earphones right out of his hands and residential burglaries, his father had DUIs, and his cousins accused a family member of rape. Juror 33 had a criminal-law degree, and she had to testify after her close friend was raped by a military superior during Army Reserve basic training. Juror 41 had taken the LSAT, attended a criminal-law class, and her brother and son had trouble with the law stemming from their intake of alcohol and drugs. Juror 47's brother-in-law was in and out of jail in various states for drug and theft crimes, and his brother-in-law's son was in jail for selling drugs. Juror 48 was molested by her cousin who was in jail for it in New York, her friends were New York police, and her uncle had 6 DUIs. Juror 51's brother was in federal prison for drug crimes, her sister's rapist was never caught, and she had experience with CASA (Court-Appointed Special Advocate) that might cause her to worry whether the parties

were providing "the complete truth." Juror 55 stated it was irksome to him that the defense was not required to present evidence, but he believed in the presumption of innocence and could be fair and impartial to both sides. Juror 57's brother was arrested many years ago for stealing and she did not think the police treated him fairly. Juror 58's co-worker was stabbed to death, her son was arrested for drunk and disorderly conduct, she had been once hit by a drunk driver, and she believed in the imposition of maximum punishment if guilt is found. The defense challenged Juror 58 for cause and after additional questioning, the trial court found the juror rehabilitated and denied the challenge. ECF Nos. 3-37 at 12–22, 71–83, 101–11, 117–23, 139–140; 3-38 at 2–7; 3-44 at 104–10, 131–54, 170–75; 3-45 at 2–4, 20–32, 41–48, 63–72.

It is conceivable that, in the absence of the administration of the truthfulness oath, individual prospective jurors may not have believed they were obligated to respond to questions with complete honesty and candor. It is also conceivable that some jurors might not have given the same responses to every question about their fairness that was posed during voir dire in this case had the oath been administered. It is correspondingly possible that counsel and the court, having received different responses, would have asked different follow-up questions, or that the parties would have chosen a different jury panel. It is not enough, however, for a petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding"; rather the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 693.

As discussed, the state-court record does not support a finding that omitting the oath resulted in a biased jury or a fundamentally unfair trial whose result is unreliable. Trial counsel received no information that the jurors committed misconduct or were biased. The jury acquitted Reed on the conspiracy charge and opted, in the penalty phase for the first-degree murder

1  conviction, for leniency by sentencing Reed to 20 years before seeking parole rather than a

2  lengthier sentence.

3       Reed claims the result of the proceedings would have been different had counsel objected

4  at trial and preserved the error because the claim could have been raised on direct review and

5  reversed without showing prejudice as a matter of state law. ECF No. 1 at 60–62.  The Ninth

6  Circuit has held that when a petitioner asserts ineffective assistance of trial counsel, "the

7  proceeding" is the trial, not a subsequent appeal, and that to consider otherwise would be

8  contrary to clearly established Supreme Court authority, including *Strickland*. *See Dickinson v.*

9  *Shinn*, 2 F.4th 851, 859–64 (9th Cir. 2021) (holding that the petitioner could not "satisfy

10  *Strickland*'s prejudice requirement for an ineffective assistance of trial counsel claim for failure

11  to object to a jury instruction based on the consequent loss of a more favorable standard of

12  appellate review" for the purpose of overcoming procedural default under a *Martinez* analysis)

13  (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 n.4 (1993)); *see also Walker v. Martel*, 709 F.3d

14  925, 941 (9th Cir. 2013) ("*Strickland* requires an actual finding that it is reasonably probable

15  that, but for the unprofessional errors, the outcome at trial would have been different."); *see also*

16  *Strickland,* 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be

17  whether counsel's conduct so undermined the proper functioning of the adversarial process that

18  the trial cannot be relied on as having produced a just result.").[7]

19  _____

20  [7] At the time of the relevant state-court decision, the Ninth Circuit had issued an unpublished
    memorandum decision, holding that a state court unreasonably applied *Strickland* when it

21  rejected a claim that trial counsel's failure to object to the imposition of a sentence based on
    (what was later held to be) an inapplicable habitual criminal statute, constituted deficient

22  performance. *Burdge v. Belleque*, 290 Fed. Appx. 73, 76–79 (2008).  The Circuit determined,
    using de novo review, that trial counsel's error was prejudicial under *Strickland* because, had

23  counsel objected, "either the sentencing judge would have agreed with the objection, or the issue
    would have been preserved for appeal," *Id.* at 79 n.4.  I am unpersuaded that *Burdge*'s prejudice
    analysis and holding applies to Reed's claim because in *Burdge*, the Circuit applied de novo

The Supreme Court of Nevada reasonably determined *Strickland*'s prejudice prong by requiring Reed to show a reasonable probability the result of the trial, rather than the appeal, would have been different but for trial counsel's deficient performance.  As discussed, that court's determination is objectively reasonable.

Therefore, I find objectively reasonable the Supreme Court of Nevada's application of *Strickland* and determination that Reed failed to demonstrate a reasonable probability the result of the proceeding would have been different had counsel objected to the trial court's failure to administer the oath. *Strickland*, 466 U.S. at  696 ("the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged" and "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").  Because the Supreme Court of Nevada's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on unreasonable determinations of fact in light of the evidence presented in the state court proceedings, I must deny Ground 3(A) of the petition.

**IV.    Certificate of Appealability**

This is a final decision adverse to Reed.  Rule 11 of the Rules Governing Section 2254 Cases requires that I issue or deny a certificate of appealability (COA).  I have *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).  A COA may issue

---

review to the prejudice analysis of the *Strickland* claim.  My analysis of the state court's application of *Strickland*'s prejudice analysis to Reed's claim is deferential as required by AEDPA.

only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  Applying this standard, a certificate of appealability is not warranted for grounds 1 and 2.  However, a certificate of appealability is warranted for ground 3(A).

**V.    Conclusion**

I THEREFORE ORDER that grounds 1, 2, and 3(A) of the petition are **denied** on the merits, and the petition **(ECF No. 1) is denied** with prejudice.

I FURTHER ORDER that any requests for an evidentiary hearing are **denied**.

I FURTHER ORDER that a Certificate of Appealability is **granted for ground 3(A) and denied for all other grounds** in the petition**.**

I FURTHER ORDER the clerk of the court to substitute Nethanjah Breitenbach for the respondent Tim Garrett.

I FURTHER ORDER the clerk of the court to enter a final judgment in favor of the respondents and against Reed dismissing this action with prejudice and to close this case.

DATED this 29th day of December, 2023.



_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE